U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    APR 16 2019

WILLIAM W. BLEVINS
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO: 18-106 |
| v. | * | SECTION: "M" |
| WALTER REYNALDO VIERA SULLON | * | |
| * * * | | |

## FACTUAL BASIS

The defendant, **WALTER REYNALDO VIERA SULLON**, has agreed to plead guilty as charged to Count One of the one-count Superseding Bill of Information. Count One charges the defendant with conspiring (1) to import cocaine hydrochloride into the United States, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1); and (2) to distribute and possess with the intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine hydrochloride, while upon the high seas on board a vessel subject to the jurisdiction of the United States, in violation of Title 46, United States Code, Section 70503(a)(1), all in violation of Title 18, United States Code, Section 371.

Should this matter have proceeded to trial, the government would have proven, through the introduction of competent testimony and other admissible evidence, the following facts, beyond a reasonable doubt, to support the allegations in the Bill of Information:

On April 22, 2018, the United States Coast Guard (USCG) detected a large container ship, later identified as the "TIAMAT," in international waters in the Eastern Pacific Ocean. The USCG cutter diverted to intercept the TIAMAT. Upon arrival at the scene, the USCG lawfully initiated radio contact with the TIAMAT. An individual aboard the TIAMAT who spoke with the USCG advised that the vessel was registered in Tanzania, that its last port of call was Manta, Ecuador, and that it was traveling to Ensenada, Mexico, to dry-dock.

The USCG found several factors to be suspicious. For example, the individual with whom radio contact was made was hesitant in answering some of the basic questions about the last port of call and next port of call, location record information reflected that the TIAMAT had loitered for an extended period of time near the Colombia/Ecuador border, which is a known location for cocaine distribution, and the TIAMAT was navigating a track line that was not the most direct route toward the next port of call, which would be irregular for a cargo vessel attempting to minimize travel time and costs. The USCG further observed that the TIAMAT was riding very high in the water, which suggested it was not carrying a full load of cargo.

The USCG lawfully boarded the TIAMAT and took control of the vessel. The USCG identified thirteen crewmembers aboard, including the eight defendants named in Bill of Information. Extensive searches were conducted of the TIAMAT, but there was no legitimate cargo found onboard. The USCG was unable to access some of the ballast tanks while at sea, so the TIAMAT was directed into Puerto Quetzal, Guatemala, so that the search could be completed.

United States law enforcement authorities in Puerto Quetzal lawfully interviewed the crew members aboard the TIAMAT. Several admitted that there were drugs onboard. Law enforcement authorities identified a raised area at the bottom of a ballast tank that had a putty-like material over it. When the putty was removed, law enforcement authorities observed an access hatch that had been cut off and then re-bolted with screws. When they opened the hatch, they found numerous packages filled with a substance that appeared to be cocaine. Field testing of the contents of two packages determined that they contained cocaine. In total, law enforcement authorities recovered approximately 3,400 kilograms of the substance.

Following the seizure of the cocaine, the United States sought permission from Tanzania, the foreign nation where the TIAMAT is registered, to consent and waive objection to the

enforcement of United States law by the United States with respect to the crew, vessel, and drugs. Tanzania granted the waiver, which transformed the TIAMAT into a "vessel subject to the jurisdiction of the United States" under Title 46, United States Code, Section 70502(c)(1)(C).

All eight of the defendants named in the Bill of Information participated in the offense. Location information showed that upon leaving port in Peru, the TIAMAT traveled north towards Manta, Ecuador and made a series of U-turns and loops over a 10-day period. It eventually anchored at Manta for a couple days and even went to port for a few hours. After that, the TIAMAT went up to Esmeraldas, Ecuador, which is near the Colombian border, made a U-turn again and headed straight to sea. This type of maneuvering is very unusual for a cargo ship like the TIAMAT. Typically, these types of ships go as directly as possible from Point A to Point B in an effort to minimize travel time and costs. The ship also was not loaded with any type of legitimate cargo. The otherwise inexplicable route the TIAMAT traveled resulted from the vessel being loaded at sea by "go fast" boats bringing cocaine from land. The crewmembers were all aware of the circuitous route, all the stops and starts, and the go fast boats approaching the TIAMAT. Further, because of the large quantity of cocaine, loading it and secreting it in the hidden compartment was labor intensive and required the efforts of the entire crew.

The cocaine onboard the TIAMAT was destined for the United States. The TIAMAT was headed to Ensenada, Mexico, which is less than 100 miles south of the United States border. An expert witness would explain that Colombia is a source country for cocaine and that cocaine is typically moved by ship from Colombia to Mexico/Central America, where it then moves by land to the U.S. border. The expert would explain that the price of cocaine increases dramatically once it crosses into the United States, so it is extremely unlikely that the cocaine would be shipped to a location so close to the United States without it being further transported over the border.

Moreover, the expert would explain that the quantity of cocaine aboard the vessel would have required a market the size of that in the United States to absorb it.

This proffer of evidence is not intended to constitute a complete statement of all facts known by the government, but rather is a minimum statement of facts intended to prove the necessary factual predicate for the guilty plea. The limited purpose of this proffer is to demonstrate that there exists a sufficient legal basis for the defendant's plea of guilty.

_____  
DAVID HALLER  
Assistant United States Attorney  

4/16/19  
Date  

_____  
WALTER REYNALDO VIERA SULLON  

4/16/19  
Date  

_____  
ARTHUR LEMANN, IV  
Attorney for Viera Sullon  

4/16/19  
Date  

4